**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FANNIN REGIONAL HOSPITAL**     )
2855 Old Highway 5 North          )
Blue Ridge, GA 30513-6248         )
                                  )
**GALESBURG COTTAGE HOSPITAL**    )
695 North Kellogg Street          )
Galesburg, IL 61401               )
                                  )
**VISTA MEDICAL CENTER EAST**     )
1324 North Sheridan Road          )
Waukegan, IL 60085                )
                                  )
**METROSOUTH MEDICAL CENTER**     )
12935 South Gregory Street        )
Blue Island, IL 60406             )
                                  )
**GATEWAY REGIONAL MEDICAL CENTER** )
2100 Madison Avenue               )
Granite City, IL 62040            )
                                  )
**CROSSROADS COMMUNITY HOSPITAL** )
8 Doctors Park Road               )
Mt Vernon, IL 62864               )
                                  )
**ALTA VISTA REGIONAL HOSPITAL**  )
1235 8th Street                   )
Las Vegas, NM 87701               )
                                  )
**MARTIN GENERAL HOSPITAL**       )
310 South McCaskey Road           )
Williamston, NC 27892             )
                                  )
**MCKENZIE-WILLAMETTE MEDICAL**   )
**CENTER**                        )
1460 G Street                     )
Springfield, OR 97477             )
                                  )
**MOUNTAIN WEST MEDICAL CENTER**  )
211 South 100 East                )
Tooele, UT 84074                  )

1

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

**EVANSTON REGIONAL HOSPITAL**      )
190 Arrowhead Drive                 )
Evanston, WY 82930                  )
                                    )
          Plaintiffs,                 )
                                    )
                                    )    Case No.
      v                              )
                                    )
                                    )
**ROBERT F. KENNEDY, JR.,** In his Capacity as  )
Secretary of the U.S. Department    )
of Health and Human Services        )
200 Independence Avenue, S.W.       )
Washington, D.C. 20201              )
                                    )
                                    )
          Defendant.                  )
_____ )

## COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

This is a civil action brought to obtain judicial review of a final decision rendered by the Provider Reimbursement Review Board (the "PRRB" or "Board"), acting as a component of the United States Department of Health and Human Services ("HHS"). The determination for which judicial review is hereby sought is the dismissal of PRRB Case No. 24-0006GC.

## JURISDICTION AND VENUE

1. This action arises under Title XVIII of the Social Security Act, as amended 42 U.S.C. §§ 1395 *et. seq*. (hereinafter, the "Medicare Act," the "Act," or the "Medicare program") and 5 U.S.C. §§ 706 *et. seq*. (hereinafter, the "Administrative Procedure Act" or the "APA").

2. The Medicare payment issue in this action pertains to how inpatient hospital days should be counted for purposes of calculating each of the Plaintiffs' (hereinafter, "Plaintiffs," "Providers," or "Plaintiff Providers") respective Medicare Disproportionate Share Hospital

("DSH") payments for their cost reports ending within calendar year ("CY") 2019 included in the subject Common Issue Related Party ("CIRP") Group.

3.    This Court has jurisdiction under 42 U.S.C. § 1395oo(f), and 28 U.S.C. § 1361. Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f), and 28 U.S.C. § 1391(e).

4.    Further, this Court has jurisdiction under 42 U.S.C. § 1395oo(f), 28 U.S.C. § 1331, and 28 U.S.C. § 1391(e) because:

(a)    Each Provider filed cost report(s) (for various fiscal year ends ("FYE"), *infra.*) as required by 42 U.S.C. § 1395oo(a);

(b)    Each Provider was dissatisfied with their respective fiscal intermediary's final determination, ". . . as to the amount of total program reimbursement due the provider . . . for the period covered by such report," as required by 42 U.S.C. § 1395oo(a)(1)(A)(i);

(c)    The aggregate amount in controversy for the subject CIRP Group exceeds $50,000, as required by 42 U.S.C. § 1395oo(b);

(d)    Each Provider was timely added to the CIRP Group appeal with the PRRB pursuant to 42 U.S.C. §1395oo(a)(3);

(e)    The Board initially dismissed the Providers' CIRP Group appeal by notifying each Provider on August 20, 2025, that the appeal in which it was participating had been dismissed;

(f)    The Providers submitted a written Request for Reconsideration of the Board's dismissal and Reinstatement of their CIRP Group appeal on October 20, 2025. The request to reconsider was

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

essentially brushed aside by the Board ("the Board *denies* the request to reconsider its dismissal ... and *denies* the request to reinstate the case") in its letter issued on January 30, 2026, which notified each Provider that the Board was essentially upholding its decision to dismiss their CIRP Group appeal;

(g) In accordance with 42 U.S.C. § 1395oo(f)(1), this civil action is filed within sixty (60) days of the date that each Provider was notified by the PRRB in writing that: (1) the Board refused to reinstate the Providers' appeal despite the Providers' good faith request for reconsideration and reinstatement; and (2) the initial dismissal of the appeal was thereupon unmodified. This final determination was issued in the Board's letter dated January 30, 2026. (PRRB Notice of Dismissal letter and Determination re: Request for Reconsideration of Dismissal and Reinstatement letter are attached together hereto as **Exhibit A**).

5.      Plaintiffs have exhausted all administrative remedies under federal law.

## PARTIES AND RELEVANT AGENCIES

6.      Each Plaintiff herein is an acute care, in-patient healthcare facility that serves a disproportionate share of low-income patients. At all relevant times, each Plaintiff Provider had a Medicare provider agreement with the Secretary of HHS and was eligible to participate in the Medicare program. Per the "Schedule of Providers" (attached hereto as **Exhibit B**), this case is with respect to the eleven (11) Providers participating in the subject CIRP Group in PRRB Case No. 24-0006GC, with each such Provider appealing the same issue for CY 2019. (Ex. B at 2).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

7. Plaintiff FANNIN REGIONAL HOSPITAL is located in Blue Ridge, GA 30513-6248; Plaintiff GALESBURG COTTAGE HOSPITAL is located in Galesburg, IL 61401; Plaintiff VISTA MEDICAL CENTER EAST is located in Waukegan, IL 60085; Plaintiff METROSOUTH MEDICAL CENTER is located in Blue Island, IL 60406; Plaintiff GATEWAY REGIONAL MEDICAL CENTER is located in Granite City, IL 62040; Plaintiff CROSSROADS COMMUNITY HOSPITAL is located in Mt Vernon, IL 62864; Plaintiff ALTA VISTA REGIONAL HOSPITAL is located in Las Vegas, NM 87701; Plaintiff MARTIN GENERAL HOSPITAL is located in Williamston, NC 27892; Plaintiff MCKENZIE-WILLAMETTE MEDICAL CENTER is located in Springfield, OR 97477; Plaintiff MOUNTAIN WEST MEDICAL CENTER is located in Tooele, UT 84074; and Plaintiff EVANSTON REGIONAL HOSPITAL is located in Evanston, WY 82930.

8. Defendant, Robert F. Kennedy Jr., Secretary of HHS (the "Secretary"), 200 Independence Avenue, S.W., Washington D.C. 20201, or his predecessors in office, is the federal officer responsible for the administration of the Medicare program. Defendant Kennedy is sued in his official capacity.

9. The Centers for Medicare & Medicaid Services ("CMS") administers the Medicare program by delegation from, and as agent of, the Secretary.

10. The Medicare Administrative Contractors ("MACs" or individually "MAC") are organizations that administer the Medicare program in a given area under contract with CMS pursuant to 42 U.S.C. § 1395h. For the Medicare group appeal at issue, the MAC designated as the CMS representative was Wisconsin Physicians Service Government Health Administrators ("WPS").

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

11.    The PRRB is an agency of HHS and acts as an administrative hearing body for Medicare reimbursement disputes between providers of Medicare services and MACs pursuant to 42 U.S.C. § 1395oo.

12.    As set forth more fully below, Plaintiffs object to the dismissal, subsequent denial of reconsideration re: dismissal and reinstatement of their group appeal, and preceding denial of their requests for extension to respond to the MAC's Substantive Claim Challenge and Motion to Dismiss by the PRRB as arbitrary and capricious. Moreover, through its actions, the Board clearly demonstrated its bad faith exercise of its discretion by dismissing Plaintiffs' group appeal.

## MEDICARE STATUTORY AND REGULATORY BACKGROUND

13.    Title XVIII of the Social Security Act, Pub. L. No. 89-97, 79 Stat. 291, as amended by 42 U.S.C. §§ 1395 *et. seq.* (hereinafter, the "Medicare program"), establishes a program of medical benefits for persons aged 65 or older, for persons under age 65 who are disabled, and for persons with end-stage renal disease. CMS, formerly the Health Care Financing Administration ("HCFA"), is the operating component of HHS charged with administering the Medicare program.

14.    Medicare reimburses the operating costs of short-term acute care hospital inpatient services primarily through the hospital Inpatient Prospective Payment System ("IPPS"). 42 U.S.C. § 1395ww(d). The IPPS Statute (the "Statute") contains several provisions that adjust reimbursements based on provider-specific factors. *See* 42 U.S.C. § 1395ww(d)(5). This case involves the provider-specific DSH adjustment, which requires the Secretary to provide increased IPPS reimbursement to providers that serve a "significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).

15.    Whether a provider qualifies for the DSH adjustment, and how large an adjustment it receives, depends on the provider's "disproportionate patient percentage" ("DPP"). 42 U.S.C. §

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

1395ww(d)(5)(F)(v). The DPP is the sum of two fractions, the so-called "Medicare Fraction" and the "Medicaid Fraction," for a provider's fiscal period. 42 U.S.C. § 1395ww(d)(5)(F)(vi). Providers whose DSH percentages meet certain thresholds receive an adjustment which results in increased IPPS payments for inpatient hospital services. 42 U.S.C. § 1395ww(d)(5)(F)(ii).

16.    The first fraction is the Medicare Fraction, also known as the "SSI Fraction," or the "Medicare/SSI Fraction". The Medicare/SSI Fraction's numerator is the number of a provider's inpatient days for such period who (for such days) were entitled to both Medicare Part A and Supplemental Security Income ("SSI") benefits, and the denominator is the number of patient days for patients entitled to Medicare Part A. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). This case involves this first fraction - the Medicare/SSI Fraction.

17.    The second fraction is the Medicaid Fraction. The Medicaid Fraction's numerator is the number of a provider's inpatient days for patients who (for such days) were eligible for medical assistance under a State Plan approved under Title XIX of the Social Security Act, 42 U.S.C. § 1396-1 *et seq*., for such period but not entitled to benefits under Medicare Part A, and the denominator is the total number of the provider's inpatient days for such period. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

18.    The Statute provides that a provider's DPP shall be determined according to the provider's cost reporting period. 42 U.S.C. 1395ww(d)(5)(F)(vi) ("in this subparagraph, the term 'disproportionate patient percentage' means, with respect to a cost reporting period of a hospital..."). The Secretary is not permitted to change the underlying substantive standards used in processing the provider's original DPP, regardless of whether such change would be beneficial or detrimental to the provider.

19.     The DSH program was enacted by Congress in the Consolidated Omnibus Budget Reconciliation Act of 1985 and was made effective beginning with discharges on or after May 1, 1986. Pub. L. No. 99272, § 9105, 100 Stat. 158-60 (Apr. 7, 1986).

20.     The Secretary implemented the DSH program through the publication of an interim final rule on May 6, 1986. 51 Fed. Reg. 16,772 (May 6, 1986). In the May 6, 1986 final rule, the Secretary decreed that only Medicare beneficiaries who are "recipients" of SSI, *i.e.*, only those Medicare beneficiaries who have *received* payment in a given month will have their inpatient hospital stay days counted in the numerator of the Medicare Fraction for that month. *Id.* at 16,777.

21.     In the August 16, 2010 final rule, the Secretary maintained that "our policy has always been to include only Medicare beneficiaries who are *entitled* to receive SSI benefits in the numerator of the [Medicare] SSI fraction." 75 Fed. Reg. 50,042, at 50,280 n.19 (Aug. 16, 2010). The Secretary's policy is that Medicare beneficiaries are deemed to be "*entitled*" to receive SSI benefits" for purposes of the DSH calculation only if they are in receipt of SSI cash benefits for a given month of his/her hospitalization for purposes of including the inpatient days associated with such beneficiaries in the numerator of the Medicare/SSI Fraction.

22.     As noted above, the Medicare/SSI Fraction is calculated by using: (a) in the numerator, the "number of such hospital's patient days...which were made up of patients who (for such days) were *entitled* to benefits under Medicare Part A and were *entitled* to supplemental security income benefits...under subchapter XVI of this chapter..."; and (b) in the denominator, the number of days of care that are furnished to patients who were *entitled* to Medicare Part A. (Emphasis added). The dispute in this case, therefore, involves the Providers' appeal of CMS's determination as to which patients are "*entitled to*" both Medicare Part A and SSI benefits for the

8

purpose of the numerator of the Medicare/SSI Fraction of the DSH calculation. 42 U.S.C. §1395ww(d)(5)(F)(vi)(I); 42 C.F.R. § 412.106(b)(2)(i)(B).

23.    The Secretary does not consider beneficiaries who received non-cash SSI benefits for a particular month to be "entitled to receive SSI benefits." And as explained below, the Secretary's policy is to omit the inpatient days of certain Medicare beneficiaries who: (1) were entitled to be paid SSI for the month(s) of their hospital stay; and (2) at the time of a data match between the Social Security Administration and CMS, were known by SSA to be entitled to SSI payment for such month(s); but (3) had not actually received payment for such month(s) by the time the data match was performed.

24.    The SSI program is a federal cash assistance program for low-income individuals who are aged, blind, or disabled, 42 U.S.C. § 1382, and is administered by the Social Security Administration ("SSA"). The SSI statute does not use the term "entitled" to SSI benefits. Rather, the SSI statute typically refers to whether an individual is "eligible for benefits." 42 U.S.C. §§ 1381a, 1382(a). To be "eligible" for SSI benefits, a person must: (1) be 65 years of age or older, blind or disabled; (2) be a lawful resident of the United States; (3) have limited income and resources; (4) not be fleeing to avoid prosecution for a crime or violating a condition of parole; and (5) file an application for benefits. 20 C.F.R. § 416.202.

25.    To enable CMS to calculate the Medicare/SSI Fraction, SSA sends CMS an annual "eligibility file" that includes information on all SSI recipients whom SSA has coded with one of three Payment Status Codes ("PSCs"): C01 (current pay), M01 (forced pay), and M02 (forced due). Although SSA has dozens of payment status codes, CMS's policy is that only C01, M01, and M02 will characterize a patient as "entitled to" SSI benefits for purposes of the numerator of the SSI Fraction. *See* 75 Fed. Reg. at 50,042, 50,280 (Aug. 16, 2010). Therefore at CMS's explicit direction

only those individuals with one of the three above-referenced payment status codes are listed on the SSA annual "eligibility file."

26. SSA does not include payment status codes in the SSI eligibility file but does include monthly indicators denoting which month(s) each person received SSI payments. *See id.* at 50,276; *see also* 51 Fed. Reg. 31,454, 31,459 (Sept. 3, 1986) (stating that the SSI file "lists all SSI recipients for a 3-year period and denotes the months during that period in which the recipient was eligible for SSI benefits").

27. CMS then computes the Medicare/SSI Fraction by matching individuals appearing in the SSA's eligibility file with its own Medicare inpatient data to identify a patient's entitlement to SSI benefits. *See,* 75 Fed. Reg. at 50,281 (Aug. 16, 2010). In other words, "CMS identifies the individuals appearing in both two data sets to determine the number of patients, and the inpatient days for those patients at each hospital, for the applicable fiscal year to calculate the hospital's SSI numerator." *Id.*

28. The data match between SSA and CMS for any given federal fiscal year ("FFY") is conducted approximately 15 months after the end of that fiscal year ("FY"). If, at the time the data match is performed, a Medicare beneficiary was paid SSI cash benefits for a month covered by the data match, any inpatient hospital days associated with such beneficiary will be counted in the numerator of the Medicare/SSI Fraction. For example, if Medicare Beneficiary is an inpatient in Hospital (a Medicare certified short-term acute care hospital) from April 29-May 6, 2022 and, by the time the SSA eligibility file is constructed for that year, was paid SSI for April but not for May, the days April 29-30 would be counted in the numerator of the Medicare/SSI Fraction, and the days May 1-6 would not be counted.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

29.     After the SSA-CMS data match is performed, CMS does not adjust the Medicare/SSI Fraction based upon subsequent, retroactive corrections to the eligibility status of a Medicare beneficiary. Thus, for example, if Medicare Beneficiary filed an application for SSI based on disability on January 1, 2023, and had an inpatient stay in July 2023, but was not, at the time of her stay, adjudicated eligible for SSI, then the Medicare Beneficiary would not appear on the SSA eligibility tape, and thus the days associated with her July 2023 stay would not be counted in the numerator of Hospital's Medicare/SSI Fraction. Moreover, if, six months after the data match for Fiscal Year 2023 was performed, the Medicare Beneficiary was awarded SSI based on disability retroactive to January 1, 2023, the days associated with Medicare Beneficiary's July 2023 stay nevertheless would not be added to the numerator of Hospital's Medicare Fraction. In this example, at the time the data match was performed, neither SSA nor CMS knew that Medicare Beneficiary would subsequently be awarded SSI based on disability.

30.     However, in contrast to the example given in the previous paragraph, there are situations in which (a) a Medicare beneficiary does not receive an SSI payment for a particular month, (b) is entitled to an SSI payment for that month, and, at the time of the data match, is known by SSA to be so entitled, but (c) inpatient days associated with such individual nevertheless are not counted. For example, if, for a given month, an individual does not have a bank account or is considered by SSA to need a representative payee, but no payee has yet been designated, or SSA does not have a valid address for such an individual, SSA will not make payment to that individual for that month. If the administrative reason for not making payment is not resolved by the time the SSI eligibility file is constructed, the inpatient days associated with such beneficiary will not be included in the numerator of the Medicare/SSI Fraction because CMS requests or directs SSA to include only individuals with payment status codes C01, M01, or M02. This, despite the fact that

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

SSA has any number of unused PSC's that would denote a Medicare beneficiary who is otherwise due an SSA cash payment for a given month but did not "receive" that payment solely because SSA did not then have a current, valid address for that beneficiary (i.e., Payment Status Code S06, currently not utilized by SSA for its annual "eligibility file").

31.     SSA's Programs Operating Manual System ("POMS") is sub-regulatory guidance published by and used by SSA to implement the SSI program. Section SI 02301.201 of the POMS is entitled "Description of SSI Post-eligibility (PE) Events." It states in the Introduction portion that "[t]he term 'eligible' in this subchapter means that a recipient meets all eligibility requirements for part or all of a past or current month(s)." Section SI 02301.201B.2. is entitled "Stop Payment." It explains that "[a] stop payment is an interruption in payment. It is not a loss of eligibility. Payments may be reinstated for past or current month(s) on a stop pay record regardless of the period in non-pay." Section SI 02301.201B.2. specifically mentions the situation in which an SSI eligible individual needs a representative payee, but the SSA field office has not appointed one as a "stop payment."

32.     Under the Secretary's policy, not all individuals who are *entitled* to SSI have their inpatient days included in the Medicare/SSI Fraction during the month(s) of their hospital stay, either because they are entitled to SSI but were not entitled to SSI cash payments during such month(s) or **were entitled to SSI cash payments but were not paid SSI cash payments for such month(s).**

33.     CMS's payment and audit functions under the Medicare program are contracted out to MACs. MACs determine payment amounts due to the providers under Medicare law and regulations. 42 U.S.C. § 1395h, 42 C.F.R. §§ 413.20(b) and 413.24(b). Although the MAC calculates the DPP, CMS computes the SSI fraction.

34.    At the close of its FY, a provider must submit a cost report to the MAC showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. § 413.20. The MAC reviews the cost report, determines the total amount of Medicare reimbursement due to the provider and issues the provider a Notice of Program Reimbursement ("NPR").

## CMS FINAL RULE 1498-R

35.    Consistent with Ruling 1498-R (April 28, 2010), CMS published a new data matching process in the FY 2011 proposed rule published on May 4, 2010, (75 Fed. Reg. 23,852, 24,002-24,007 (May 4, 2010)) and finalized that data matching process in the final rule published on August 16, 2010 ("FY 2011 Final Rule"). 75 Fed. Reg. 50,041, 50,280-50,281 (Aug. 16, 2010).

36.    In the preamble discussion to the FY 2011 Final Rule, CMS acknowledged a public comment that: (1) requested that "CMS include both paid and unpaid days for both SSI entitlement and Medicare entitlement such that there would be consistency between the numerator and denominator of the SSI fraction;" and (2) provided examples of "several SSI codes that represent individuals who were eligible for SSI but not eligible for SSI payments, that should be included as SSI-entitled for purposes of the data match process." *Id*. at 50,280. CMS responded in detail to this comment and explained that CMS interprets SSI entitlement to correspond with any month for which an individual *receives* payment of SSI benefits.

37.    In this regard, CMS stated that the inclusion of the three SSI codes denoted as C01, M01, and M02 "accurately captures all SSI-entitled individuals during the month(s) they are entitled to receive SSI benefits". *Id.* at 50,280-50,281. CMS explicitly rejected the inclusion of other SSA codes because "SSI entitlement can change from time to time" and none of these codes "would be used to describe an individual who was entitled to receive SSI benefits during the month

that one of these codes was used." *Id.* Of course, Plaintiffs herein strongly disagree with CMS's self-serving assessment. As did several commenters, who requested inclusion of codes such as S06 *supra* (suspended payment because the recipient's whereabouts are unknown based on an undelivered check). And yet, despite the common sense basis for such requests, CMS dogmatically refused to utilize any such unused codes despite the undeniable fact that such codes are assigned to individuals who were ***clearly entitled*** to an SSI payment for a given month. Finally, in the preamble, CMS confirms that "[t]he same data matching process [used for FY 2011 and beyond] will be used to calculate SSI fractions for cost reporting periods covered under the Ruling [1498R]." *Id*. at 50,285.

## REGULATORY HISTORY OF THE APPROPRIATE COST REPORT CLAIM REQUIREMENT

38.     The appropriate claims requirements in the current version of 42 C.F.R. § 413.24(j) were initially published in CMS's FY 2015 proposed rule in the Federal Register on May 15, 2014. *See* 79 Fed. Reg. 28206 (May 15, 2014). This proposed rule was subject to the statutorily required public notice-and-comment period and received many comments opposed to the finalization of problematic aspects of the rule.

39.     Among many criticisms of the FY 2015 proposed rule submitted by the public, the American Hospital Association ("AHA") submitted a comment (attached as **Exhibit H**) vehemently opposing CMS's appropriate cost report claim policy stating:

> CMS's proposed change would inappropriately limit hospitals' ability to exercise their appeal rights based solely on the discretion of MACs. Specifically, under the proposed change, while a provider that fails to include an item on its cost report could file an amended cost report or request a reopening by its MAC to add the excluded item, whether to accept an amended cost report or issue a reopening is entirely at the MAC's discretion under current Medicare regulations.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

\* \* \*

> The proposal unduly vests the MACs with overly broad authority over hospitals' right to appeal items on the cost report. In the preamble to the proposed rule, CMS states that it anticipates that providers and MACs will engage in a back-and-forth process to resolve issues that might currently end in appeal, and that this would help alleviate the workload of the PRRB. However, even assuming that reducing the PRRB's workload is an appropriate goal, it is wholly inappropriate to do so by limiting providers' appeals rights in such a manner. CMS presents no evidence that the MACs are equipped and prepared to engage in this type of back-and-forth process. Moreover, hospitals report that MACs routinely decline to accept an amended or reopen a cost report rather than making a considered decision after a thorough assessment of the facts.

(*Id.* at 58).

40.     The Federation of American Hospitals ("FAH") noted similar concerns (comments attached as **Exhibit I**), urging CMS to withdraw its "proposal altogether" pointing out that the statutory authority under which CMS proposed its FY 2015 final rule, namely "sections 1815(a), 1833(e), and 1886(f)(1) of the [Social Security] Act," is "misplaced." The FAH specified that:

> ...section 1815(a) of the Act does not require any level of detail to be provided in a cost report in order to claim reimbursement on appeal. Section 1815(a) pertains only to the requirements for making interim payments to providers. Section 1833(e) of the Act does require that the Secretary not make payments without there being sufficient documentation, but this provision by its terms applies to payment under Part B, not to hospitals when seeking Part A payment, such as DSH payment. Section 1886(f)(1) of the Act merely requires the Secretary to have a cost reporting system. It says nothing about requiring providers to claim the precise amount of reimbursement due on their cost reports or be foreclosed from pursuing additional reimbursement on appeal. More importantly, hospitals do not disagree that they need to furnish appropriate information in order to receive Medicare payment. Yet, hospitals should not be prohibited from claiming payment based on information acquired after they file their cost reports. If the later-acquired information supports a hospital's claim for additional payment, the MAC will not make payment unless and until it has evaluated the information and determined that payment is appropriate.

(*Id.* at 44, 48).

41.     Despite the comments and concerns expressed by the public, the Secretary finalized the rule with minimal changes on November 13, 2015. *See* 79 Fed. Reg. 50199 (Aug. 22, 2014); 80 Fed. Reg. 70551 (Nov. 13, 2015). CMS misused its statutory authority granted by sections 1815(a), 1833(e), and 1886(f)(1) of the Act to propose and finalize a restrictive change to CMS's cost report appeals policy as an attempt "...to circumvent the PRRB statute and regulations upheld by the courts through a related proposal disguised as a change to the cost reporting regulations. And in doing so, it has the effect, potentially purposeful, of very significantly limiting otherwise allowable Medicare payment to providers based only on information available at an arbitrary point in time: in simple terms – another unjustified payment cut to hospitals." (Ex. I at 44).

## THE RELEVANT MEDICARE APPEALS PROCESS

42.     At the close of its fiscal year, a provider must submit a cost report to the MAC showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. § 413.20. Under the Medicare program, each hospital's MAC is required to analyze and audit the hospital's annually submitted Medicare cost report and issue a Medicare NPR, which informs the hospital of the final determination of its total Medicare reimbursement for the hospital's fiscal year. 42 C.F.R. § 405.1803. In addition to including costs on its cost report, a hospital is also required to make a claim, or alternatively self-disallow, for any adjustment to its basic IPPS payment adjustment, such as the DSH adjustment. 42 C.F.R. § 413.24(j).

43.     If a hospital is dissatisfied with its MAC's final determination (or any revised final determination) of the hospital's total Medicare program reimbursement for a fiscal year, as reflected in the NPR, and the hospital satisfies the amount in controversy requirements, the hospital has a right to obtain a hearing before the Board by filing an appeal within 180 days of receiving its NPR (or any revised NPR). 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835(a). In addition to having the authority to

make substantive decisions concerning Medicare reimbursement appeals, the Board is authorized to decide questions relating to its jurisdiction and procedure. *See* 42 U.S.C. § 1395oo. Further, the Board is required to "affirm, modify, or reverse . . . *and* to make any other revisions on matters covered by such cost report[.]" *See* 42 U.S.C. § 1395oo(d) (emphasis added). That is, the Board cannot avoid making necessary revisions on matters properly before it.

44.     The PRRB lacks the authority to adjudicate the validity of the Secretary's regulations and CMS Rulings. 42 C.F.R. § 405.1867. Thus, when a hospital is entitled to a PRRB hearing, the hospital may request that the PRRB determine whether it has the authority to decide the question of law or regulations relevant to the appeal. 42 U.S.C. § 1395oo(f)(l). If the PRRB determines that the legal issues raised are outside the scope of its own authority, it must certify the case for "expedited judicial review" or "EJR." *Id*. In that event, the hospital has exhausted its administrative remedies, the Secretary's determination is final, and the hospital may commence a civil action for judicial review of the final determination of the Secretary. *See* 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842. An EJR determination is not subject to review by the Secretary or the CMS Administrator but, rather, allows the hospital to proceed directly to court.

45.     A hospital may obtain judicial review by filing suit within 60 days of receipt of the Secretary's final administrative decision in the United States District Court for the judicial district in which the hospital is located or in the United States District Court for the District of Columbia. 42 U.S.C. § 1395oo(f)(1). The date of receipt of such a decision is presumed to be five (5) days after the date of issuance. *See* 42 C.F.R. § 405.1801(a)(1)(iii). The Secretary is the proper defendant in such an action. *See* 42 C.F.R. § 405.1877(a)(2). Under 42 U.S.C. § 1395oo(f)(2), interest is to be awarded in favor of the prevailing party in an action brought under 42 U.S.C. § 1395oo(f). Under

42 U.S.C. § 1395g(d), CMS is required to pay interest on underpayments to Medicare providers, if the underpayment is not paid within thirty days of a "final determination."

## APPLICABILITY OF THE APA TO MEDICARE APPEALS

46.     Under 42 U.S.C. § 1395oo(f)(1), an action brought for judicial review of final agency action involving PRRB appeals "shall be tried pursuant to the applicable provisions under chapter 7 of title 5 of the U.S. Code, which contains the Administrative Procedure Act (APA). Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

## *ADVOCATE CHRIST MEDICAL CENTER v. KENNEDY*

47.     As noted above, Title XVI of the Social Security Act establishes the Supplemental Security Income (SSI) program which provides cash payments to financially needy individuals who are aged, blind, or disabled. Individuals must apply for this benefit, and their eligibility to receive cash payments is determined monthly, depending on their income and resources during the month. Once an individual qualifies for the cash payment during a particular month, the individual remains enrolled in the SSI program, and their *eligibility* for cash payments is determined each month until the individual fails to qualify for cash payments for a period of twelve consecutive months. While enrolled in the program, individuals may also receive two further benefits: (1) they are eligible for a subsidy under Medicare Part D, which they receive for at least six months regardless of whether they continue to qualify for monthly payments; and (2) they are eligible to receive vocational rehabilitation services, which eligible enrollees may continue to use after they fail to qualify for monthly payments.

48.     On April 29, 2025, The U.S. Supreme Court issued its opinion in *Advocate Christ Medical Center v. Kennedy*, 605 U.S. ____ (2025) [2025 WL 1224342] (a true and correct copy attached as **Exhibit J**), siding with the government and holding that, for purposes of the Medicare disproportionate share hospital (DSH) calculation, Medicare beneficiaries "entitled to supplemental security income [(SSI)] benefits under Title XVI of the Social Security Act" means only those patients who are ***eligible*** to receive cash SSI payments during the month of hospitalization. "Today we hold that a person is entitled to such [SSI] benefits when she is ***eligible*** to receive a cash payment during the month of her hospitalization." (emphasis added) The Supreme Court's ruling affirms the D.C. Circuit's September 2023 decision, which had affirmed the D.C. District Court's grant of summary judgment to HHS in June 2022.

49.     In 2022, the Supreme Court ruled in *Becerra v. Empire Health Foundation,* 597 U.S. 424 (2002), that "entitled to [Medicare Part A] benefits" included "all those qualifying for the [Medicare] program," whether or not Medicare paid for that hospital stay. 597 U.S. 424, 445 (2022). However, in *Empire*, the Court left open the question of whether the phrase "entitled to [SSI] benefits" also includes all those who qualify for the SSI program. *Advocate Christ* filled in that 'blank' by ruling that,

> "[A]n individual is 'entitled to [SSI] benefits['] ... when she is eligible to receive an SSI cash payment. And because eligibility is determined on a monthly basis, an individual is considered 'entitled to [SSI] benefits' for purposes of the Medicare [/SSI] fraction only if she is eligible for such benefits during the month of her hospitalization." *Id.*

50.     The 7-2 *Advocate Christ* decision saw the majority siding with HHS, which interpreted the phrase "entitled to SSI benefits" to denote only those patients who are determined to

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

be *entitled* to a cash payment during the month they were hospitalized as inpatients. However and although the majority agreed with the government that the numerator of the Medicare/SSI Fraction should only include patients that were *eligible* for a cash benefit in the specific month at issue, it quite deliberately left open the question of whether CMS's current policy appropriately captured all such patients. As noted above, patients who have had their SSI cash benefits suspended because their whereabout were unknown or because they did not accept direct deposit, for example, are excluded from CMS's calculation. And since the *Advocate Christ* Court stated that "we take no position on whether HHS has unreasonably excluded particular [status] codes from the Medicare [/SSI] fraction," hospitals can and have continued to argue that while these and similar patients may not have *received* a cash payment for some administrative reason, they were nonetheless "*eligible* to receive a cash payment" and were therefore inappropriately excluded under the standard announced by the Court. And indeed, this is precisely the issue upon which Plaintiffs appealed in its Notice of Appeal filed with the PRRB on October 3, 2023:

> "The Provider(s) protest(s) CMS's policy of excluding unpaid SSI days from the numerator of the Medicare [/SSI] fraction. Despite CMS's seemingly contrary policy of treating unpaid Part A days as days entitled to benefits under Part A, CMS requires that a beneficiary be paid SSI benefits (or "covered" by SSI) during the period of his or her hospital stay in order for such days to be considered "entitled to supplemental security income benefits" and included in the numerator of the SSI fraction.

> CMS does not include days in the numerator of the SSI fraction when individuals were eligible for SSI but did not receive a SSI payment during their hospitalization for such reasons as failure of the beneficiary to have a valid address, representative payee problems, Medicaid paying for more than 50 percent of the cost of care in a medical facility, or the period of hospitalization is during the first month of eligibility before a cash payment is made. None of these reasons affect the patient's indigency.

CMS's policy of applying different interpretations to the same term, "entitled," used in the same sentence of the statute is the epitome of arbitrary and capricious agency action and must be reversed. *See Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 20 n.1 (D.C. Cir. 2011) (Kavanaugh, J., concurring) ("HHS thus interprets the word 'entitled' differently within the same sentence of the statute. The only thing that unifies the Government's inconsistent definitions of this term is its apparent policy of paying out as little money as possible. I appreciate the desire for frugality, but not in derogation of law."); *see also Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 799 (D.C. Cir. 1984) ("It would be arbitrary and capricious for [the Secretary] to bring varying interpretations of the statute to bear, depending upon whether the result helps or hurts Medicare's balance sheets....").

In rulemaking, commenters specifically requested that CMS include other payment codes that identified "entitled" individuals, but the Secretary nonetheless adopted a policy of including only codes that identify people receiving actual SSI cash payment. Id. For example, commenters requested that codes S06 (suspended payment because recipients' whereabouts are unknown based on "undeliverable checks, mail, reports of change or a change of address") and S07 ("checks returned for reasons that are unclear or for reasons other than address or a representative payee problem") be included. CMS refused the suggestion.

Because CMS's treatment of unpaid Part A days as "days entitled to benefits under part A" was upheld by the Supreme Court in *Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 597 S. Ct. June 24, 2022 WL 227680 (2022), CMS must apply the same interpretation of the word "entitled" in the context of "entitled to supplemental security income benefits." By doing so, CMS will necessarily have to widen the number of SSI status codes it treats as being "entitled to SSI benefits" to encompass not just the three codes CMS currently includes, but all codes that reflect *eligibility* for SSI benefits."

(*See* Exhibit A, at 4-5)

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

51.     Had the Board been required to address this very issue (left open by the Court in *Advocate Christ*), it may have found itself in the unfamiliar position of having to disagree with CMS's long-held policy of instructing SSA to include *only* the three PSCs indicative of an otherwise SSI eligible beneficiary who actually *received* her SSI payment in the month of her hospitalization to be afforded its place in the numerator of the Medicare/ SSI fraction. But as described below, only through its arbitrary and capricious dismissal of Plaintiffs' appeal did the Board escape ruling and applying a wholly justifiable and equitable stance.

## FACTS SPECIFIC TO THIS MATTER

52.     It is acknowledged by the PRRB that it received Plaintiffs' CIRP Group Appeal Request. The subject of the CIRP group appeal was described as, "Disproportionate Share Hospital Payment (DSH)/Supplemental Security Income (SSI) Unduly Narrow Definition of SSI Entitlement." (Plaintiffs' issue statement attached as **Exhibit C** at 2).

53.     In Plaintiffs' appeal, and critical to restate, Plaintiffs disputed:

> ...CMS's policy of excluding unpaid SSI days from the numerator of the Medicare [/SSI] fraction. Despite CMS's seemingly contrary policy of treating unpaid Part A days as days entitled to benefits under Part A, CMS requires that a beneficiary be paid SSI benefits (or 'covered' by SSI) during the period of his or her hospital stay in order for such days to be considered 'entitled to supplemental security income benefits' and included in the numerator of the SSI fraction.

> ***

> Because CMS's treatment of unpaid Part A days as 'days entitled to benefits under part A' was upheld by the Supreme Court in *Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 597 S. Ct. June 24, 2022 WL 227680 (2022), CMS must apply the same interpretation of the word 'entitled' in the context of 'entitled to supplemental security income benefits.' By doing so, CMS will necessarily have to widen the number of SSI status codes it treats as being 'entitled to SSI benefits' to encompass not just the three codes CMS currently includes, but all codes that reflect *eligibility* for SSI benefits.

*Id*.

54.     On December 13, 2024, the Federal Specialized Services ("FSS") submitted a Substantive Claim Challenge ("SCC") on behalf of WPS challenging whether the Plaintiff Providers properly protested the subject issue under appeal pursuant to 42 C.F.R. § 413.24(j). Shortly afterwards, FSS filed a Motion to Dismiss ("MTD") Plaintiffs' group appeal on behalf of WPS on December 17, 2024. Plaintiffs' Group representative, Quality Reimbursement Services, Inc. ("QRS"), timely responded to WPS's SCC and MTD in two letters submitted on January 11, 2025 via Office of Hearings Case and Document Management System ("OH CDMS") (response letters attached as **Exhibit D**), requesting "...an additional ... 30 days to respond..." to both the SCC and MTD. (Ex. D at 2-3).

55.     On January 15, 2025, the Board unreasonably denied QRS's requests for extensions of time to reply to WPS's SCC and MTD by letter (attached as **Exhibit E**). The Board essentially brushed off QRS's requests, noting "...that neither of the Providers' submissions includes a reason for seeking a thirty-day extension, nor do they provide any justification of the necessity of any extension." (Ex. E at 2).

56.     As QRS had missed both the January 12 and January 16, 2025 deadlines for a response to WPS's SCC and MTD respectively, and solely due to the Board's denial of its request for extensions, the Board proceeded to dismiss the subject CIRP Group appeal on August 20, 2025. (Ex. A at 9). The Board granted WPS's MTD because Plaintiffs "...failed to identify or document any specific SSI patient days they believe should be included in their respective Medicare [/SSI] fractions or explain how the exclusion of such days affects reimbursement..." and failed "...to identify the SSI days they believe should be included in the numerators of their respective Medicare

[/SSI] fractions, nor the codes that they feel should have been excluded from inclusion in the Medicare [/SSI] fractions," thus failing to "...file a complete preliminary position paper in violation of Board Rule 25 and 42 C.F.R. § 405.1853(b)(2)." (Ex. A at 8) (emphasis added). The Board's deliberate mischaracterization of the *specific* language employed by Plaintiffs to, for instance, *express the excluded codes* when clearly they did so, doomed Plaintiffs' appeal from the outset. The Board further noted "...that the Providers also failed to include in their cost reports appropriate claims for the specific item under appeal as prescribed in 42 C.F.R. § 413.24(j)." (*Id.* at 9).

57.    Following the Board's dismissal, QRS filed a Motion for Reconsideration and Reinstatement ("MTR") (attached as **Exhibit F**) on October 20, 2025, refuting the Board's claims of omission with respect to the Providers' PPP (attached as **Exhibit G**), and attempting to clarify that the data made available to the Providers  (i.e. '...[the Providers'] own records, MEDPAR data, and records from the Social Security Administration...') was insufficient to '...identify the SSI days [the Providers] believe should be included in the numerators of their respective Medicare [/SSI] fractions.'" (Ex. F at 2-3). The Providers further rebutted the Board's claims, pointing out that their PPP had identified specific SSI payment codes that "...should be included in the data matching process used to determine the SSI ratio for the Medicare DSH calculation." (Ex. F at 3); (Ex. G at 13).

58.    Nevertheless, the Board denied QRS's MTR on January 30, 2026, reaffirming its position in its initial dismissal citing a lack of evidence to establish the Providers' claims. (*See* Ex. A at 17-18). This denial was issued notwithstanding QRS's request "...that the Board reconsider its dismissal of and reinstate PRRB Case No. 24-0006GC, and refrain from issuing any final decision thereof pending the outcome of the pending court challenges [(*e.g.*, *University of Washington v. Kennedy*)] to CMS's so-called 'three-code policy.'" (Ex. F at 3).

59.     Plaintiffs contend that the Board does not have authority to rule on the subject issue of PRRB Case No. 24-0006GC as Plaintiffs are challenging "...CMS's policy of excluding unpaid SSI days from the numerator of the Medicare [/SSI] fraction." (Ex. C at 2). The Board is without authority to decide the issue of the validity of the challenged regulations. *See* 42 C.F.R. § 405.1867. The MAC's request for a listing of days for which the required data was unavailable to Plaintiffs and its subsequent MTD based on the lack of such a listing was arbitrary and capricious.

60.     Plaintiffs further contend that the appropriate claims requirements in the current version of 42 C.F.R. § 413.24(j) are invalid as their promulgation was a misuse by CMS of its statutory authority under sections 1815(a), 1833(e), and 1886(f)(1) of the Social Security Act, thus the MAC's appeal thereto and Board's concurrence in Plaintiffs' appeal were similarly invalid. The Board's concurrence with the MAC's reasoning in its initial dismissal thus reflects the Board's arbitrary and capricious nature by upholding its dismissal of the appeal while denying Plaintiffs' MTR, especially given that the Board has acknowledged in the caselaw cited in Plaintiffs' MTR that it did not have the authority to issue a decision with respect to the subject issue of Plaintiffs' group appeal.

## COUNT I

### Judicial Review Under the Medicare Act and the APA
### (The Board's Dismissal and Denial of Reinstatement of the CIRP Group appeal was Arbitrary, Capricious, an Abuse of Discretion, and Otherwise Contrary to Law)

61.     Plaintiff Hospitals incorporate by reference paragraphs 1-60 of this Complaint.

62.     The APA prohibits agency action that is "...arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" 5 U.S.C. § 706(2)(A).

63.     The Board's dismissal of Plaintiffs' CIRP Group appeal was arbitrary, capricious, an abuse of discretion, and otherwise contrary to the Medicare Act.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

## COUNT II

**Judicial Review Under the Medicare Act and the APA
(CMS's Promulgation of 42 C.F.R. § 413.24(j) and the Board's Application Thereof was
Contrary to CMS's Statutory Authority)**

64. Plaintiff Hospitals incorporate by reference paragraphs 1-60 of this Complaint.

65. The APA prohibits agency action that is "...arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" 5 U.S.C. § 706(2)(A).

66. CMS's promulgation of 42 C.F.R. § 413.24(j) was arbitrary, capricious, an abuse of discretion, and otherwise contrary to the Social Security Act, thus the Board's application of this regulation was also contrary to statute.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests for an Order:

(a) Reversing and setting aside the PRRB decision of dismissal and denial of reinstatement of the Plaintiffs' appeal;

(b) Remanding the appeal back to the Board for full adjudication on the merits;

(c) Awarding the costs of suit incurred by Plaintiffs;

(d) Awarding Plaintiffs interest as required by 42 U.S.C. § 1395oo(f)(2); and,

(e) For such other and further relief as the Court may deem just and proper under the circumstances.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

Dated: March  31, 2026

Respectfully submitted,

ALAN J. SEDLEY LAW CORPORATION

By: */s/ Alan J. Sedley*
Alan J. Sedley, Esq. Bay # OH0017
18880 Douglas, Suite 417
Irvine, CA 92612
Phone: 818.601.0098
asedley@sedleyhealthlaw.com

*Attorney for Plaintiffs*

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT